My next case for argument is United States v. Novak and Morrison v. Hawkins Yeah, Mr. Hawkins? May it please the court, my name is Charles Hawkins. I'm here on behalf of Anna Novak and Mr. Morrison to request that their Rule 11 pleas be vacated and they be allowed to withdraw those pleas based upon the fact that they were not knowingly and voluntarily made at the time. It's well settled that a guilty plea cannot be truly knowing or voluntary unless the defendant has an understanding of the law in relation to the facts of the case. This court noted in United States v. Pineda v. Buenaventura that unless the defendant fully comprehends the elements of the crime to which they are confessing, their pleas cannot be said to have been knowing and voluntary. Now, I bring that case to the court's attention at the outset because it is very similar to Ms. Novak and Mr. Morrison's case. The court in that decision identified a totality of the circumstances test, identifying five areas of inquiry to determine whether or not a plea is knowing and voluntary. The first is the complexity of the charge. The charge in this case, in Count 11, is distribution of an analog drug substance. There probably aren't many federal offenses that are more complex than federal drug analog violations. Complex because it deals with having to determine whether there is substantially similar chemical structure and substantially similar pharmacological effects, which is so difficult because there is no definition in the scientific community or the legal community as to what substantially similar is. Do they have to go to the drug community then to identify those? No. That seems to be some of what happened. You said, yeah, this is what happened to me after I smoked it or smelled it or something like that. Yeah, but as Dr. Lynn testified for the government, we have no definition of substantial similarity in the DEA. Our division doesn't have any. There isn't one in the scientific community. We sit down, look at the specific substance on an ad hoc basis, then we get together at a conference, and then we vote on each different situation whether or not, in our opinion, it is substantially similar. So what would you like the government to do? I'd like the government to go back to Congress and have them define substantial similarity, Your Honor, and take the vagueness out of the statute. And how would you define substantial similarity? Me personally, I'm not a chemist, but I'd suggest the way it be done is to have the scientific community made up of the DEA, which has their six or seven chemists, and a segment of the scientific community from the professors and practitioners that analyze these chemicals and get together and try and reach a decision about what a reasonable definition of substantial similarity is. How will the lay people apply that? They'd at least have a definition, Your Honor. And do them any good if it's a scientific definition. Then they could go to an expert, to a chemist, and ask them if it fits the definition. As it's out there today, a lay person can't go to a chemist and get an answer that can be relied upon to act upon. That's the difficulty with this type of offense. There is no ability. I don't understand. Why can't he go to the scientist and say, I want to sell, you know, X, and I don't know its formula, and I don't know whether it's similar to the formula for heroin or what have you. Then the expert would compare them. They've done that in this case. They've done that in the Carlson case. There were experts on one side, there were experts on the other side, but there is no definition for either one of those two experts to deal with. The lay experts person comes in and testifies, in my scientific opinion, based upon my training and experience in chemistry, this molecule, in this case, XRL-11, is not substantially similar to JHR-18 or JWH-18, and then you've got that opinion, and then over here you have the decision by the DEA that it is substantially similar. We've got this molecule and this molecule, and they may be different, but it's substantially similar to this analog drug over here that's been labeled as a controlled substance on the Schedule I or Schedule II list. What, how is synthetic marijuana labeled? Pardon me, sir? Synthetic marijuana. Where does that come into the picture? That is JWH-18. It's been scheduled as a controlled substance. It is governed on the schedules, and that's what they're saying over here. XR-11 is substantially similar to JWH-18 because these molecules, we have the rings and we have this here, but XRL-11 is substantially similar in chemical composition and substantially similar in its pharmacological effect. What happened in 2013 with this particular analog? On May 2nd, the analog was sold in Ashland, Wisconsin. On May 16th, it was listed. At the time of the count of the plea, it was not a scheduled controlled substance. It was a quote-unquote controlled substance analog, and when you look at the statements that the defendants make, and I'm getting a little ahead of myself, but I think it's important to point out, when you look at the statements the defendants make, there is no conversation with any of them in them pleading guilty to an analog. They say they're pleading guilty to a controlled substance offense, which would be true if XLR-11 had been scheduled. Sorry, sir. But as you yourself said, the people who want to get into this dangerous business, risking prosecution, they ought to ask a chemist or whatever about the chemical structure of this analog, alleged analog, how similar it is to the obviously illegal drugs. They did, they have, they get their opinion, and then the DEA says something different, and the prosecution stops. What is more common than to have clashing experts' testimony? And the way you deal with that, although most judges don't deal with it this way, in fact, they can't deal with it, they don't, is you, the judge, under Rule 706 of the Federal Rules of Evidence, appoints a neutral expert. And what definition does the neutral expert use? The point of the neutral expert is that he is someone who has not taken a position on this issue before, but who has the training that enables him to offer an opinion. And because he's not a party witness, he's not biased. It doesn't mean he's infallible, it means he's neutral. But how does that prevent the defendant from being prosecuted after that decision is made, if it's a decision that is made for the seller, how does that decision prevent him from being prosecuted when the statute says, if indeed it is substantially similar by this opinion, the United States Attorney's Office files a charge against the defendant? How does the individual defendant have fair notice as to what conduct is restricted or precluded by the law? Well, if he was wise, he would have consulted a chemist or someone before he went into that business. And I'm trying to suggest in this case they did. They not only consulted a chemist, they consulted the local district attorney. They quit selling the stuff two months before the search warrants were issued in this case. They did, and they please clearly say it, we never intended to do anything wrong. What did they plead guilty to? Distribution of a controlled substance analog, but they never admitted that they intended to violate the law. They never admitted facts that support distribution of a controlled substance analog. That's totally illogical. How can you plead guilty to distributing an illegal drug and say you didn't distribute an illegal drug? Well, it's not a scheduled illegal drug, and what the government asked the judge to do was apply, although they didn't use this word, to apply the Turcotte inference, that if you have information over here that suggests to you that human consumption is being engaged in for the purpose of getting high and the pharmacological effects are the same, you can infer that they knew that the chemical substance was substantially similar. This is after the so-called date of whatever they labeled this stuff. I mean, whatever date you said, May 16th or something. No, the offense is from before that date. It's not a controlled substance at that point. It's an analog. That's why there's this difficulty. Well, it is difficult, and they plead guilty. They didn't know what they were pleading guilty to? Is that what it is? Yes, Your Honor. Mr. Hawkins, you're familiar, are you not, with this May 2nd J.C. Moon Facebook posting? Yes, sir. Pretty good indication. They knew that XR11 was a controlled substance, right? It was pretty good information that they knew it was going to become a controlled substance. It was pretty good information that the defendants never intended to violate the law because they said, we are not going to be selling it anymore once they got notice. It goes, there's so many things. Well, they said we're going to, we're selling it right now because it's going to be banned pretty soon. Right. That's a pretty good inference. It's no different, I guess, when you go back to Prohibition when somebody says, hey, we're selling all the whiskey we got today because in two weeks we can't sell it anymore. It doesn't mean at the time that that whiskey was being sold that those individuals ever intend to violate the laws of Prohibition. By selling those drugs on May 2nd, or I shouldn't say drugs, controlled substance analogs on May 2nd does not mean they sold a controlled substance. Okay. Well, thank you, Mr. Hawkins. Mr. Vajeroy. Good morning. I'm John Voter, the U.S. Attorney up in Madison. I've been with this case from the start, Your Honor. I want to start with just a couple of basic points in response to what Mr. Hawkins was saying that I hope sheds some clarity here. First, when we start talking about controlled substance analogs or controlled substances, federal law defines a controlled substance analog, if intended for human consumption, as a controlled substance. So in the plea process itself, what seems to be sort of language floating back and forth is actually accurate because these controlled substance analogs, XLR-11, UR-144, PB-22, and 5F PB-22, the four that are an issue in our case, were intended for human consumption and is pretty clear from the plea record. Why does the law require that the defendant know that the chemical structure, and that is similar to that of the conventional controlled substance? And that was going to be my next point. The law post-McFadden does not require that sort of knowledge. It can be part of our proof. It does not need to be part of our proof. I think what is happening is, and Mr. Hawkins, I think, conflates really two different things from these charges. To convict a defendant, we have to prove, as a matter of fact, that this is a controlled substance analog. We would have called Dr. Trecky. We would have called Dr. Van Lin. They were our effects and structure experts. And as a matter of fact, they would have offered expert testimony, just like the experts in the Carlson case and the experts in all the other cases. And had there been other folks, they'd have got up and said, no, I think the molecules are shifted a little too much. They're not substantially structured, chemically structured. But that's the first thing. Is it an analog as a fact? But I think you have to separate that, then, from what we have to prove to show the defendants knowingly distributed a controlled substance analog. And post-McFadden, the way I read McFadden, and I think it's a fair reading, there's really two ways to prove that. And that's really what this guilty plea is about, the guilty plea issue. It isn't about could we have proven as a fact this is a controlled substance analog, because that has never been contested after the Daubert hearing. We can do it two ways post-McFadden. One, that they knew the substance was a controlled substance, or excuse me, that they knew the substance was controlled by the Controlled Substance Act, which includes the Analog Act. We can prove that, McFadden tells us, circumstantially. We can prove it by showing how they concealed activities, how they had knowledge that the thing produced a high, the substance produced a high. And it seems to be pretty clear from McFadden that if we chose that way of proving knowledge, we do not need to prove knowledge of chemical structure. And I think there's a good reason for reading it that way. That sort of proof, which was the case here, really does apply to sellers. It applies to the people, the businessmen and women in Ashland, Wisconsin, who are buying the product from ZenBio and AI Biotech and all these chemical companies, if you will, around the country and the world. So the sellers, they're getting this stuff. They know that people are lining up in 20 below zero weather on Monday morning, and they are ripping these packages apart and running down the streets of Ashland. So they know the effects. Okay, so they know the effects, but they say at that point it wasn't illegal. I think one has to look at their answers to Judge Peterson's, I think, very patient, persistent questioning. And when one looks at them in the totality, you see that they really did know the effects. And what the Supreme Court tells us is, and it's different from Turcotte, and I think we have to be clear on that, the knowledge of things like the effects or the way you're selling them and secret words you're using and whatnot, which was the case here, that supports an inference that they knew this was a controlled substance. Perhaps not a perfect analogy. Potentially controlled substances. When I say controlled substance, and I'm sorry, I should go back to my first point. When you know it's a controlled substance, a controlled substance analog, if this thing you're selling is an analog and it's intended for human consumption, it's defined as a controlled substance. Now, is that a fact that the court finds? It would have been found as a matter of judicial notice. It's what the statutory definition is in 8-0. I mean this particular analog. What the court found here. Based on what people are saying about it. Right. The court found that this was an analog, therefore a controlled substance, as a matter of fact, because we proffered the expert, in our factual basis, the expert testimony showing that we would have called experts who would have said, in this specific count, XLR-11 is substantially similar in chemical structure and XLR-11 is substantially similar in its effects, its hallucinogenic effects. So the court finds that as a fact. The question here became, did the defendants know what they were selling was something other than some incense? And I think the court was very careful to explain what knowingly means in this context. I tried to assist in that process. It was the focus of all of Judge Peterson's questions, really. The court made it clear in its questions to Ms. Novak and Mr. Morrison that this could be done circumstantially. And that's, I think, getting back to that point, I think it's a key thing, and it goes to sort of the totality of it here, that once we can prove that a defendant knows the effects, for example, knows that it generates a high, that it's like marijuana or whatever, then one can infer that they knew it was controlled under the Controlled Substance Act. In Turcotte, the inference was, if we proved you knew the effects, we would infer that you knew the chemical structure. I don't think post-McFadden that's really, that's not appropriate. That's not the way the Department of Justice approaches this. The inference is different. It isn't that we are inferring that they knew the chemical structure. The inference is we are inferring, as Justice Thomas wrote, that they knew it was controlled. And this case is such a good example, I think, because just in the plea proffered, Mr. Morrison ultimately says, I know people smoked it, so he knows it's for human consumption. I know people used it to get high. I knew it was like marijuana, and I knew it was a controlled substance. And I think that is very powerful circumstantial proof through their own answers that they knowingly were selling this controlled substance analog. As opposed to incense or something? Right. I mean, they were selling incense in the front of the store, and if you price it out by gram, the incense costs you a couple bucks. And the incense in the back was costing you a lot, lot more. And the other part in the record for the total factual basis, we had witnesses in the PSR who talked about being their testers, who worked for them. It was a very elaborate system, and it is for most of these cases. If you walked into J.C. Moon and you said, I want to buy some really powerful stuff that's really got a good high, you were actually given a 24-hour timeout, and that's in PSR Paragraph 27. You had to leave the store. The people who worked there, like Ms. Hunt, and she's in PSR Paragraph 26, they were specifically trained by these defendants to say, it's all about the strength of smell. It has nothing to do with potency. And they sold all sorts of smoking devices, what are called one-hitters, little smoking devices. They were not allowed to ever refer to those as smoking devices. These were to use your incense. Were these the salespeople? Yeah. And yet they were the addicts? Absolutely. Ms. Hunt was actually hired because she was such a frequent customer. They then provided her product to use. It's in the PSR, specific instructions given to her. Use it when you're sober. Don't be drinking and partying. Use it when you're sober. So when you come back and tell us, the defendants, which one is really strong, we know it's because you were using Bizarro or Funky Monkey or these various products, and we know it's not because of some other. So they wanted a clear control group. There were two or three other people in the PSR, and also testified at the sentencing hearing, that would also test the products. They weren't employees. They were customers. They would be in that store five or six times a day, spending hundreds of dollars a day. And then they were given product and said, come back and tell us which one's the potent, really potent. And one other thing, two other things, I guess, and I'll get to Judge Flom's point on the Facebook posting. There was also an e-mail, and it's in the PSR, where Ms. Novak herself in February of 2013, well before the charge that they pled to, sends an e-mail to a supplier and says, we're a small business in northern Wisconsin, but we're doing $5,000 to $11,000 a week, and our customers like it strong. That statement cannot refer to we're doing $11,000 a week because they love a strong smell. With the rest of her statements that she knew people were smoking, she knew they used it to get a buzz, we sold it after it had an effect like marijuana, and then she directly, in questioning and plea, directly addresses that Facebook posting because they knew, as of May 2, that this thing they were selling, not only was it giving people a buzz, not only was it giving them a high, not only was it like marijuana, they knew that in two weeks, it was actually going to be not an analog, but an actual controlled substance, and their response was to continue to sell, and then after that date, to sell different analogs. That would be the PB-22 and the 5M-22. Well, they claim they only pleaded guilty to something before that. Well, we chose that count specifically, quite frankly, because it was easier for them to get their head around the knowledge. I think the proof shows that whatever I believe about all the counts prior to that, on that specific day, they not only knew this was like marijuana, they not only knew it gave you a high, they not only knew it was being used for human consumption, they knew that at that point, the government actually said, this isn't an analog anymore, this is going to be a controlled substance, and it wasn't like we said we're still thinking about it. DEA said, in two weeks, this is a controlled substance, just because we have to give notice in the Federal Register. Do judges always ask all these questions of people who plead guilty? What's the point of pleading guilty if you don't get an inquisition from the judge? The lawyers who represented the defendants at the plea hearing and the defendants, in my view, they wanted to plead guilty. The judge knew they wanted to plead guilty, but these defendants had spent... Well, they're adults, for goodness sake. Why can't they be allowed to plead guilty without all this questioning? I don't get it. And I know my time's up, Your Honor, but I think the thing is they had spent years saying it's not for human consumption, it's just incense, and like a fraud defendant, perhaps, they had trouble actually saying what was going on. And I think Judge Peterson turned the clock back several years. I don't know that Judge Shabazz asked that many questions. Judge Peterson very patiently just kept plugging away. You're right. It didn't feel like an inquisition there. It does look like one on the record. But as the people in my office said, I've been too invested in this case. The court only gave you ten minutes. Don't take the hour you want. Well, I assume also the income tax is not an issue, right? Well, it was raised and relates to Mr. Morrison's knowing plea, not as to Ms. Novak's. She clearly was the one running the skim. But he admitted that he knew the skim was going on. He knew that they gave just the non-skim money, if you will, to the tax preparer. So I think that is not nearly the issue that we're dealing with. It's a shorter sentence, I guess. It did end up in a shorter sentence. They each got three years for the tax charge, concurrent to the sentences on the drug charge. Okay, thank you. Thanks very much. Mr. Hawkins, anything further? Just briefly, thank you. In regard to Mr. Morrison's tax count, I'd refer the court to the transcript of his plea, wherein he said, I'm in my early stages of Alzheimer's. I don't have anything to do with running the business. Yeah, I know they put 50s and 100s into the safe. I don't know how much money we were making. I don't know this. I don't know that. I didn't have anything to do with it. I signed the tax return. I believed it was true and accurate. Those are the Rule 11 colloquy statements by Mr. Morrison. So why did he plead guilty? I have no idea, Your Honor. I wasn't there. Second, in regard to these comments regarding knowledge and controlled substances, I direct the court's attention to the McFadden decision at page 2305. And they talk about the individual's knowledge. And they talk about the means and the manners in which that can be proved. And the first is by proving that the substance which was being dealt is a controlled substance. We don't have that, because it's not on the list. Second, it can be established by evidence the defendant knew the specific analog he was dealing with, even if he did not know its legal status and its analog. And then it goes into the substantial similarity that they have to know. Thank you. OK, thank you very much, Mr. Hawkins and Mr. Fitzgerald.